IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Orlando Division

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey Corporation, <br><br> Plaintiff, <br><br> v. <br><br> CAROL GARDINA, an individual; GEORGE GARDINA, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO: 6:23-cv-1125 |

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiff The Prudential Insurance Company of America ("Prudential") for its complaint against Carol Gardina and George Gardina, sued in their individual capacities (collectively, the "Gardinas"), alleges as follows.

## NATURE OF ACTION

1. This is a fraud action. Carol and George Gardina are a husband and wife who hold qualified long-term care ("LTC") insurance policies issued by Prudential.[1] Prudential files this lawsuit against the Gardinas, its insureds, because

---

[1] The policy benefits provided under "qualified" LTC insurance policies, like the Gardinas' policies, are generally exempt from federal income taxes. The requirements for such policies, including specific benefits eligibility triggers, are mandated by federal law as set forth in 26 United States Code section 7702B, a provision of the Internal Revenue Code, enacted in 1997 as part of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

it recently discovered that the Gardinas have conspired together to defraud Prudential of over $1 million in LTC insurance benefits over the course of 20 years.

2. The Gardinas' long-running fraud has been bold and egregious. For 20 years, Defendant Carol Gardina presented herself to Prudential as bedbound and severely cognitively and functionally impaired, allegedly the result of a brain aneurysm suffered in 2002. For years the Gardinas consistently represented to Prudential that Mrs. Gardina is unable to perform any physical activity; they further presented cognition scores consistent with dementia so severe that, if true, she would be altogether unable to function in ordinary society. The Gardinas also represented that Mrs. Gardina needs constant hands-on assistance for all major daily living activities, including walking, bathing and dressing, among others.

3. Based on these representations about Ms. Gardina's health—which she and her husband put on display at staged benefits eligibility assessments they orchestrated over the years—Prudential paid her substantial monetary benefits, over $1 million in total (which the Gardinas treated as tax-free-income), for decades.

4. In addition to actively conspiring with Mrs. Gardina as to claims against her policy, Mr. Gardina also defrauded Prudential under his own qualified LTC policy. Beginning in or around 2016 (and continuing until very recently), Mr. Gardina began presenting himself as severely physically disabled— wheelchair/bedbound, unable to drive, and unable to lift his arms or hold clothes.

US_ACTIVE\123805742\V-12

He repeatedly represented to Prudential that he requires total assistance for activities of daily living like bathing and eating, among others.

5.    Surveillance obtained by Prudential shows a different story. The Gardinas intentionally misrepresented their claimed cognitive and functional impairments.  Surveillance shows both are capable of driving (together and on their own), performing strenuous physical labor (like carrying lumber and strapping a boat to a trailer), walking, housekeeping, shopping, eating/dining without assistance, and numerous other living activities that they told Prudential they were unable to perform.  As proven on camera, repeatedly, the Gardinas' actual cognitive and functional conditions are fundamentally incompatible with what they told Prudential.  Simply put, the Gardinas have been caught lying.

6.    For years, the Gardinas kept their true condition concealed from Prudential by feigning inability to perform ADLs during policy-required assessments (and were outwardly obstructionist during those assessments), inventing pretextual reasons to prevent assessments from happening, refusing to sign HIPAA authorizations to allow Prudential to obtain required documentation, and most recently, threatening nurses personally in attempts to prevent them from performing proper assessments of their conditions.

7.    Prudential thus brings this action to recover monetary damages, for a judicial declaration that the Gardinas are not owed past or future benefits, and for a judicial declaration that their respective long-term care insurance policies are void.

## PARTIES

8.    Plaintiff Prudential is a New Jersey corporation with its headquarters in Newark, New Jersey.

9.    Defendant Mrs. Gardina is an individual residing and domiciled in Orlando, Florida.

10.    Defendant Mr. Gardina is an individual residing and domiciled in Orlando, Florida.

11.    The true names and capacities of DOES 1 through 10, inclusive, whether individual, corporate, associate or otherwise, are currently unknown to Prudential, which therefore sues these defendants by such fictitious names.  When the true name, capacities, and relationships of such defendants are ascertained, Prudential will ask leave of Court to amend this Complaint to insert the same.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1332, 2201 and 2202.  There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  A substantial number of the events or omissions giving rise to this dispute occurred in this District.  Further, this is the judicial district in which Defendants reside, and all Defendants are residents of the State in which this District is located.

## FACTUAL ALLEGATIONS

### The Policies

14.     Prudential issued two separate LTC insurance policies to the Gardinas on February 8, 2002: (1) policy No. 0000022492 to Defendant Carol Gardina; and (2) policy No. 0000022493 to Defendant George Gardina (together, the "Policies").[2]

15.     The Policies provide federal income tax-free benefits ("LTC Benefits") to individuals with a "Chronic Illness or Disability."

16.     Submitting a claim form and a bill is not enough to ensure that LTC Benefits will be paid.  To receive LTC Benefits, the insured must first be assessed by an "Assessor."  The Policies define an Assessor as follows:

> **Assessor –** A Licensed Health Care Practitioner who is qualified to evaluate conditions relevant to your functional or cognitive ability.  Qualifications are based on training and experience, and may include health care industry, state or national standards.

17.     The Policies define a Licensed Health Care Practitioner as follows:

> **Licensed Health Care Practitioner –** A Physician, a Registered Nurse, a licensed social worker, or another

---

[2] The Gardinas' Policies are identical in language.

US_ACTIVE\123805742\V-12

professional individual who meets the requirements prescribed by the United States Secretary of the Treasury.

18.     The Policies' benefits-eligibility triggers mirror the language used for tax-qualified long-term care policies, defined as a "qualified long-term care insurance contract" under HIPAA, which sets forth the benefits-eligibility triggers mandated by federal law.  *See* 26 U.S.C. § 7702B ("Treatment of qualified long-term care insurance").

19.     Federal law thus sets forth the benefits-eligibility triggers for the Policies, which must be adhered to for each policy to receive favorable tax treatment under federal tax laws.

20.     Confirming the tax status of the Policies, they state as follows:

> **TAX STATUS:  This Policy is intended to be a Qualified Long Term Care Insurance Contract as defined by the Internal Revenue Code Section 7702B(b).**

21.     To remain eligible for tax-qualified LTC Benefits, federal law requires the insured to be assessed by a Licensed Health Care Practitioner on an annual basis. 26 U.S.C. § 7702B(c)(2)(A) (stating the term "chronically ill individual" shall "not include any individual otherwise meeting the requirements . . . unless within the preceding 12-month period a licensed health care practitioner has certified that such individual meets such requirements.").

22.     The Policies incorporate this same requirement, stating as follows:

-6-

You will be reassessed periodically to determine if you are still eligible for benefits.  To comply with federal income tax requirements, you must be assessed at least once each year.

23.     Consistent with federal law, the Policies define Chronic Illness or Disability as follows:

**Chronic Illness Or Disability -** An illness or disability in which there is:
1) A loss of the ability to perform, without Substantial Assistance, at least two Activities of Daily Living for a period of at least 90 consecutive days; or
2) A severe Cognitive Impairment, *which* requires Substantial Supervision to protect you from threats to health or safety.

24.     The Policies define Substantial Assistance as follows:

**Substantial Assistance -**
1) The physical assistance of another person without which you would not be able to perform an Activity of Daily Living; or
2) The constant presence of another person within arm's reach that is necessary to prevent, by physical intervention, injury to you while you are performing an Activity of Daily Living.

25.     The Policies define Activities of Daily Living ("ADL") as follows:

**Activities of Daily Living**

**Bathing -** Washing oneself by sponge bath, or in either a tub or shower, including the task of getting into or out of the tub or shower.

**Continence -** The ability to maintain control of bowel and bladder function, or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

**Dressing -** Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

-7-

**Eating -** Feeding oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by feeding tube or intravenously.

**Toileting -** Getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

**Transferring -** Sufficient mobility to move into or out of a bed, chair or wheelchair or to move from place to place, either by walking, using a wheelchair or by other means.

26.     The Policies define a Cognitive Impairment as follows:

**Cognitive Impairment -** A loss or deterioration in intellectual capacity that is:
1) Comparable to and includes Alzheimer's disease and similar forms of irreversible dementia;
2) Measured by clinical evidence and standardized tests that reliably measure impairment in the individual's
    a) short-term or long term memory;
    b) orientation as to people, places, or time and
    c) deductive or abstract reasoning.

27.     The Policies define Substantial Supervision as follows:

**Substantial Supervision -** Continual oversight that may include cueing by verbal prompting, gestures, or other demonstrations by another person, and which is necessary to protect you from threats to your health or safety.

28.     Prudential's claim form includes a Florida disclosure, which reads as

follows:

**FLORIDA RESIDENTS –** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

-8-

**Carol Gardina's Claim For LTC Benefits**

29.    In or around April 2002, two months after the Gardinas purchased the Policies, Mrs. Gardina allegedly suffered a subarachnoid (brain) hemorrhage that purportedly left her physically debilitated and cognitively impaired.  She was 48 years old at that time.

30.    In or around August 2002, Mrs. Gardina, through and with the assistance of Defendant Mr. Gardina, her power of attorney, submitted a claim for benefits to Prudential.  The Gardinas represented and certified to Prudential that she qualified for LTC Benefits.

31.    Based on the Gardinas' certified representations, as well as contemporaneous medical records they authorized to be released to Prudential reflecting treatment for Mrs. Gardina's hemorrhage, Prudential approved her claim.[3]

32.    In 2004, Prudential reached out to Mr. Gardina (as Mrs. Gardina's POA) to begin its routine reassessment of Mrs. Gardina's claim for LTC Benefits, as required by her Policy and Federal law.[4]  *Supra* at ¶¶ 1, n.1; 18-21.

---

[3] Mr. Gardina was difficult and obstinate during Mrs. Gardina's initial claims process.  For example, during a January 2003 assessment of Mrs. Gardina, it was reported that Mr. Gardina was "adverse to evaluation of his wife and is documented to have been verbally abusive to the assessor."  With hindsight, the Gardinas' obstructionism helped cover their tracks and hindered Prudential from discovering their fraud earlier.

[4] As noted above, the annual assessment/certification process is mandated by statute (26 U.S.C. § 7702B(c)(2)(A)) and expressly required by the Policies.  It is also practically important as an insureds condition may often improve after an acute medical event, which may result in them going "off-claim" depending on the results of assessments during the recertification process.

US_ACTIVE\123805742\V-12

33.     As part of its review, Prudential requested an independent medical examination ("IME") of Mrs. Gardina by a licensed health care practitioner.

34.     Mr. Gardina imposed significant restrictions and conditions on the IME itself.   With hindsight, it appears Mr. Gardina was intentionally obstructing Prudential's ability to ascertain Mrs. Gardina's true health condition.   At the time, however, to justify his restrictions he told Prudential that Mrs. Gardina was bedbound, unable to sit up or walk without assistance, and could not tolerate sitting. He also represented that Mrs. Gardina suffered from severe cognitive impairment.

35.     The resulting physician's IME report noted that Mr. Gardina provided "most" of the medical history.   At the IME, Mrs. Gardina was presented as being unable to walk without assistance.   She reportedly was unable to use a walker and found it painful to even sit in a wheelchair.   While her cognition scores were in-line with a moderate cognitive impairment, the reviewer noted Mrs. Gardina was unable to explain "in a cohesive fashion" what she does most of each day.   The report further noted that Mr. Gardina described her as largely bedbound.

36.     Based on these representations and cited conditions, the IME report concluded Mrs. Gardina was eligible under both of the Policy's triggers (ADLs, and severe cognitive impairment).   Prudential therefore approved Mrs. Gardina's claim.

37.     Mrs. Gardina's subsequent reassessment and certification history was similar.   Between 2005 and 2022, the Gardinas repeatedly and consistently

-10-

represented to Prudential—through monthly submission of signed certified claim forms, and at annual, routine eligibility assessments—that Mrs. Gardina required substantial assistance with 2 or more ADLs and was severely cognitively impaired.

38.    Mrs. Gardina's April 2022 benefit eligibility assessment is indicative of the representations the Gardinas routinely made to Prudential about her health. They represented to Prudential that she required substantial assistance with 2 or more ADLs, was bedbound and was severely cognitively impaired, even as Mr. Gardina refused to allow Mrs. Gardina to demonstrate her purported inability to perform her ADLs.  Instead, Mr. Gardina self-servingly reported her purported health condition. As a result, Mrs. Gardina's April 2022 benefit eligibility assessment states:

a) That Mrs. Gardina presented as severely cognitively impaired. Mrs. Gardina scored only a 3/30 on a mini-mental status examination, a score which equates with severe, late-stage dementia.[5]

b) Mr. Gardina reported Mrs. Gardina was bedbound and required hands-on care for her safety.  On this basis, he refused to allow her to demonstrate any ADL, as he didn't want the assessor "to bother" Mrs. Gardina.  He further stated Mrs. Gardina required a wheelchair "every time" she moves around.

---

[5] An MMSE score of 3/30 (or any score less than 10/30) indicates the most severe level of cognitive impairment.  With a score this low, Mrs. Gardina presented as requiring around-the-clock assistance and constant supervision, and being incapable of routine physical activities (like walking or even swallowing).  *See*, *e.g.*, American Academy of Neurology, *Measure #1: Staging of Dementia*, https://www.aan.com/siteassets/home-page/policy-and-guidelines/quality/registry/axon-quality-measures/17dementiaaxon08_pg.pdf (explaining an MMSE score of less than 10 indicates severe dementia and is associated with requiring "considerable or total assistance with personal care . . . . In the terminal phase, patients become bed bound . . . .").

US_ACTIVE\123805742\V-12

c) Mr. Gardina reported that Mrs. Gardina is unable to perform a single instrumental activity of daily living as a result of her "cognitive impairment." He also reported she requires assistance "every time" with using the telephone, shopping, food preparation, housekeeping, laundry, transportation, and money management.

39. As with Mrs. Gardina's first reassessment, Mr. Gardina was difficult and obstructive at times during Mrs. Gardina's reassessment history. He characterized Prudential's requests for Mrs. Gardina's medical records as overreaching. He refused to provide basic information to Prudential (like the full name of her purported caretaker) and refused to sign HIPAA-compliant medical records release authorizations that would permit Prudential to obtain Mrs. Gardina's complete medical records.

40. Impeded by Mr. Gardina's conduct and induced by the Gardinas' representations—which, as explained below, are now known to be outright misrepresentations—between 2003 and 2023 Prudential paid Mrs. Gardina over $1,000,000 in tax-qualified LTC Benefits.

**George Gardina Claim For Benefits**

41. By 2016, the Gardinas had been paid hundreds of thousands of dollars in LTC Benefits by Prudential on Mrs. Gardina's Policy. This was not enough. Mr. Gardina then began submitting his own claims for LTC Benefits on his Policy, claiming that his torn rotator cuffs resulted in him needing hands-on assistance with three ADLs (bathing, dressing, and toileting).

-12-

42.     As with his wife's claim, Mr. Gardina was difficult during the claim process for his own Policy.  He was vague about his medical condition, and initially refused to authorize release of his medical records or sign Prudential's HIPAA-compliant medical records release authorization forms.   The medical records Prudential did receive for Mr. Gardina were mixed in their support of his claim. Nevertheless, in January 2017, Prudential—giving Mr. Gardina the benefit of the doubt—approved his claim under the ADL trigger.

43.     Prudential reassessed Mr. Gardina's eligibility multiple times between 2017 and 2020.  At these annual assessments, and in monthly claim forms submitted to Prudential, Mr. Gardina attested he was severely physically disabled.  He presented as requiring substantial assistance with toileting, dressing, bathing, ambulation, and transferring.  He represented to Prudential that he required total assistance with transportation, shopping, laundry, meal preparation, medication management, and housekeeping.

44.     During Mr. Gardina's 2020 reassessment, Prudential repeatedly requested medical records from Mr. Gardina and asked that he sign a HIPAA authorization for release of his medical records so that his claim could be properly assessed.  He generally either refused to sign a medical records release authorization, or altogether failed to respond.  On June 15, 2020, Prudential unequivocally informed Mr. Gardina—in bold, underlined font—that if a valid, signed HIPAA

authorization was not received, his claim would be closed.  Mr. Gardina did not respond and his claim was closed in July 2020.

45.    Mr. Gardina appealed in August 2020.  He again failed to provide a valid HIPAA authorization or to permit the release of medical records to Prudential. Prudential therefore closed Mr. Gardina's appeal in December 2020.

46.    In May 2022, Mr. Gardina submitted a new claim for LTC Benefits. Mr. Gardina orally represented to Prudential that he was confined to a wheelchair and was unable to use his arms.  On multiple signed and certified claim forms submitted by Mr. Gardina, he also attested that he was chronically ill because he required assistance with bathing, dressing, toileting and transferring.

47.    Through various claim submissions, Mr. Gardina ultimately represented to Prudential that he was unable to perform even a single ADL without standby assistance.  During his benefit eligibility assessment, he also refused to demonstrate a single ADL.  Further, he self-reported a litany of problems, including: (i) that he is unable to walk and is confined to a wheelchair; (ii) he cannot bear weight on his feet;  (iii) he cannot raise his hands to eat; (iv) he cannot lift his arms; (v) he is unable to shop as he is chair/bedbound; (vi) he is "unable to lift anything heavier than a straw"; (vii) he cannot sit up in a "regular car" for any length of time; and (viii) he finds it extremely difficult to get into a car.

//

-14-

**Prudential Obtains Surveillance Revealing The Gardinas' Fraud**

48.    In 2022, Mr. Gardina's obstinate behavior and sudden poor health (a marked contrast from what Prudential was previously told) raised serious red flags at Prudential with respect to Mr. Gardina's claim.  Prudential obtained surveillance of Mr. Gardina.  This surveillance, which was focused initially on Mr. Gardina, also showed a gray-haired woman performing several activities alongside Mr. Gardina.  The resulting surveillance report was unable to confirm this woman's identity.  As described below, however, Prudential ultimately came to discover this woman was Mrs. Gardina, exposing the Gardinas' egregious long-running fraud.

49.    Surveillance of the Gardinas took place on the following dates:  (i) June 9-11, 2022; (ii) June 25, 2022; (iii) July 5-6, 2022; (iv) July 8-10, 2022; and (v) August 9, 2022.

50.    The resulting reports and videos show the Gardinas acting in a manner that contradicts the picture of the severely ill individuals they painted to Prudential in monthly claim forms and various annual assessments.

51.    For instance, the surveillance showed:

a) Both of the Gardinas were fully capable of driving.  Each was observed driving, on their own, a large Ford truck with an attached trailer.  They were both observed entering and exiting their vehicles without assistance, and using their arms to pull themselves into their truck.  For instance, Mr. Gardina was observed driving on June 9—some 11 days before he would provide a completed daily activities questionnaire where he attested, on a document that comes with a Florida fraud

-15-

warning, that he had not driven in the past three months.  Mrs. Gardina was observed driving on her own on numerous occasions—this despite her repeated attestations that she was bedbound, severely cognitively impaired, and was completely incapable of driving.







-16-

b) Mr. Gardina was observed bending forward at the waist and cranking the handle on the back of the truck to release the trailer. Mr. and Mrs. Gardina were further observed driving their Ford E350 with an attached trailer to a boat dealer. There, they were observed securing a boat[6] to the trailer.



---

[6] Public records reveal that Mr. Gardina purchased a 9-foot fishing boat in late 2019, while he was on claim and receiving LTC Benefits, supposedly unable to lift his arms above his head.

-17-

c) Mrs. Gardina was observed performing routine chores, shopping, housework—all activities she attested she was completely incapable of performing.  For example, Mrs. Gardina was observed shopping on her own, independently carrying several shopping bags between vehicles, filling up her car with gas, carrying packages, and carrying lumber.  She was observed to be independent of others on numerous occasions and without any physical supervision.







-18-

d) Mr. Gardina was observed performing similar activities, as well as performing physical labor.  For instance, Mr. Gardina was observed bending at the waist, lifting and carrying items, raising a drink and a slice of pizza to his mouth, using power tools, and lifting the tongue of the trailer and pushing the trailer up an incline on his driveway completely unassisted.







-19-

52.    On August 9, 2022, on the last day of surveillance, the investigator tasked with surveillance conversed with Mr. Gardina.  Mr. Gardina confirmed his identity orally, but refused to provide photo confirmation.  He also refused to confirm whether Mrs. Gardina was the woman surveilled alongside him.

**Prudential's Prior Attempts To Investigate Carol Gardina Were Thwarted**

53.    As explained below, Prudential only recently discovered the Gardinas' fraud.  This was not, however, because it did nothing to look into Mrs. Gardina's health.  For example, in 2012, given the duration of her time on claim compared to her relatively low age (she was around 58 years old at that time), Prudential requested an activities check of Mrs. Gardina.  The resulting report suggested that an unidentified female was observed outside at one of the Gardinas' properties, but did not confirm the woman identified was Mrs. Gardina.

54.    Then, fairly soon after this activities check, as part of her annual benefits eligibility reassessment, Prudential received an activities questionnaire from Mrs. Gardina's physician reporting that she required substantial assistance for all of her ADLs and suffered from a severe cognitive impairment.  This questionnaire was based on the Gardinas' self-reporting, and a staged demonstration of Mrs. Gardina's health orchestrated by the Gardinas.  It was effective in lulling Prudential into believing she was indeed in very poor health, so she could not possibly be the woman seen.  The Gardinas' fraud was not discovered.

US_ACTIVE\123805742\V-12

55.     In April 2015, as in prior years, Prudential began its annual reassessment of Mrs. Gardina's claim.  It sent a daily activities questionnaire to be filled out by the Gardinas, a standard HIPAA-compliant authorization for release of Mrs. Gardina's medical records, and requested a face-to-face benefits eligibility assessment.  All of these are routine benefits assessment tools used broadly in the long-term care insurance industry to assess and ultimately certify claims, as mandated by HIPAA and the Policies.

56.     In response, however, Mr. Gardina again became obstinate, sending Prudential a series of responses which were at times hostile and erratic, and which ultimately refused to provide the information requested, instead accusing Prudential of seeking to violate Mrs. Gardina's privacy by requesting her medical records.  For example, in one communication, he accused Prudential of "unnecessarily participating in what is an unreasonable insatiable global appetite for personal data harvesting."  In another, he asserted that Prudential already had enough information to assess his wife's eligibility, as "[h]er medical condition after suffering a ruptured brain aneurysm has changed little in the subsequent 13 years."

57.     After months of back and forth, Mr. Gardina ultimately did not agree to provide the records requested, and told Prudential he was revoking any prior authorizations for release of medical information he had previously given, despite outreach efforts by Prudential to allay any legitimate concerns he might have relating

US_ACTIVE\123805742\V-12

to privacy or the purpose for the medical records.  The Gardinas did, however, send Prudential a physician-completed questionnaire, dated November 2015, which again reported that Mrs. Gardina was severely cognitively impaired and required hands-on assistance for several ADLs.  Based on this representation, Prudential ultimately reassessed Mrs. Gardina as eligible, keeping her on-claim.

58.    Mr. Gardina's conduct over those past several months had, however, raised some concern.  In 2016, Prudential thus commissioned video surveillance of the Gardinas.  The resulting surveillance was inconclusive.  Surveillance showed Mr. Gardina walking with an unidentified woman, who appeared to be in reasonably well health.

59.    Soon after this, however, Prudential received a completed benefit eligibility assessment (BEA) for Mrs. Gardina performed by a third-party vendor.  It found that Mrs. Gardina was physically incapable of performing her ADLs and had scored a 6/30 on her MMSE (indicating severe cognitive impairment).  Prudential now knows this BEA was procured through the Gardinas staging false demonstrations about her health, obstructing Prudential's ability to gather information, and making false representations about her health.  The Gardinas had again averted discovery of their fraud.

//

//

US_ACTIVE\123805742\V-12

**The Gardinas All But Confirm They Are Committing Fraud When Confronted With Surveillance Evidence By Prudential**

60.   After receiving the 2022 surveillance reports and videos, Prudential referred the Gardinas to internal Prudential investigators.  On October 10, 2022, Prudential investigators interviewed Mr. Gardina over the telephone.  Mr. Gardina spoke on behalf of Mrs. Gardina and himself.  He refused to be on video or to review any documents while on the phone with Prudential.

61.   Mr. Gardina was obstinate and combative throughout.  He refused to confirm any prior information provided in the Gardinas' various benefit eligibility assessments or daily activities questionnaires.  He again refused to identify Mrs. Gardina as the surveilled woman.

62.   But the answers Mr. Gardina did provide in response to Prudential's questions were damning.  Tellingly, he did not even try to deny that the woman in the video was indeed Mrs. Gardina.  For instance, Mr. Gardina tried to explain away Mrs. Gardina's driving (without supervision) by stating that she drives but he accompanies her by laying down in the back of the car and shouting out guidance.  Someone with a 3/30 MMSE would almost certainly be medically incapable of driving a vehicle at all, with or without supervision.  To say Mr. Gardina's outlandish explanation was not credible would be an understatement.

-23-

US_ACTIVE\123805742\V-12

63.     In September 2022, Prudential denied Mr. Gardina's claim.   He appealed the claim denial, but again refused to authorize the release of his medical records, resulting in the denial of his appeal.[7]

64.     In October 2022, Prudential sent a letter to the Gardinas explaining Prudential had received surveillance video of Mrs. Gardina driving a vehicle, shopping and loading items in her van, and carrying lumber.  Prudential asked the Gardinas to respond with a signed written explanation as to how she was able to perform the tasks in the surveillance video, but was unable to complete any activities of daily living during her April 2022 benefit eligibility assessment.  Prudential also again asked Mrs. Gardina to authorize release of her medical records.  The Gardinas never responded to this letter.

65.     Giving Mrs. Gardina every opportunity to clear her name and ensure there were no mistakes made concerning her claim, while also attempting to confirm she was indeed the woman in the video surveillance, in March 2023 Prudential ordered a benefits eligibility assessment be conducted by a licensed healthcare practitioner.   The Gardinas initially refused to schedule the assessment, but

---

[7] In response to an April 24, 2023 letter informing Mr. Gardina that his appeal was withdrawn due to his failure to complete and return a HIPAA authorization form, Mr. Gardina called Prudential customer service representatives on or around May 2.  On that call, he threatened the representative of being "in violation of HIPAA" and said that he wanted to "avoid prosecuting a lawsuit and having a young woman like you end up in court or in prison."  He explained that he did not want to see the representative "or any member of her family" harmed by Prudential.  He promised to sue and explained he did not want to see the representative "caught up in the mess."

US_ACTIVE\123805742\V-12

ultimately agreed to the assessment after Prudential told them that Mrs. Gardina's claim would be denied if they did not cooperate, even providing stills of Mrs. Gardina from the surveillance to explain why it had questions.

66.    At her April 2023 benefit eligibility assessment, Mr. Gardina stonewalled the assessor Prudential sent.  He refused to provide basic information to the assessor, such as the name of Mrs. Gardina's purported caretaker, or dates on which she had last seen medical providers.  He again painted a picture of a severely ill woman, while not permitting Mrs. Gardina to demonstrate even a single ADL.

67.    In the narrative accompanying the benefit eligibility assessment, the reviewing assessor noted that Mr. Gardina remarked that Prudential's request to have Mrs. Gardina perform ADLs during her assessment was a "HIPAA violation."[8] Confusingly, and in clear contradiction to prior benefit eligibility assessments, he now remarked that Mrs. Gardina can "walk and move around," but requires cueing to perform basic tasks.

---

[8] Despite his purported concerns over his privacy, Mr. Gardina apparently has no trouble violating the privacy of others.  Prior to the April 21, 2023 benefit eligibility assessment, Mr. Gardina sent an oblique, yet threatening, email to the assessor that included her personal home address, full name, previous employer, and contact information.  This information was never provided to Mr. Gardina by the assessor's employer or Prudential.  On information and belief, Mr. Gardina sent this communication to the assessor for the sole purpose of intimidating and harassing the assessor.

US_ACTIVE\123805742\V-12

68.     The assessor, at Prudential's direction, took a digital photograph of the Gardinas.  This photograph confirmed that Mrs. Gardina was the woman surveilled in 2016 and 2022:



69.     Prudential now had confirmation, for the first time, that the Gardinas were defrauding it.

70.     On April 28, 2023, assessors reached out to schedule an additional benefit eligibility assessment of Mrs. Gardina in order to visualize her ADL demonstration.  Mr. Gardina again attempted to impose restrictions on this benefit eligibility assessment and, accordingly, it did not occur.

71.     On or around June 13, 2023, Prudential denied Mrs. Gardina's claim.

///

///

///

///

-26-

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Fraudulent Misrepresentation against Carol and George Gardina)

72.    Prudential incorporates the allegations in paragraphs 1 through 71 by this reference.

73.    The Gardinas willfully and intentionally engaged in fraud and misrepresentation.

74.    The Gardinas intentionally misrepresented to Prudential the true and material facts regarding their eligibility under their respective Policies for LTC Benefits.

75.    The Gardinas' acts, representations, and communications with Prudential about the status of their respective health and eligibility under their respective Policies for LTC Benefits were knowingly false and made with the intent that Prudential rely on their false representations in order to deceive Prudential so that the Gardinas could unlawfully misappropriate LTC Benefits for their own personal benefit.

76.    Prudential reasonably relied on the Gardinas' representations.

77.    Prior to undertaking and completing its claim investigation, Prudential was unaware of the falsity of the Gardinas' representations and was therefore justified in relying on the representations when it paid benefits.

78.     Prudential's reliance on the Gardinas' representations was a substantial factor in causing its harm.  As a direct and proximate result of the Gardinas' fraudulent misrepresentations, Prudential paid benefits of at least $1,187,580.67 to Carol Gardina.  Prudential incurred additional losses in an amount to be determined at trial relating to the cost of investigating the claim.

79.     Prudential further contends that a result of the Gardinas' fraudulent misrepresentations, the Gardinas' Policies are void or should be voided.  *Lincoln Benefit Life Co. v. Dallal*, 520 F.Supp.3d 1237, 1246-47 (C.D. Cal. 2021) (voiding a long-term care policy, which otherwise lacked an express void for fraud provision, pursuant to the district court's powers in equity where insurer established insured committed fraud), *aff'd*, 2022 WL 605709 (9th Cir. Mar. 1, 2022); *Circle Fin. Co. v. Peacock*, 399 So. 2d 81, 84 (Fla. Dist. Ct. App. 1981) ("[I]n equitable actions, it is recognized that the courts have the fullest liberty in molding decrees to the necessity of the action . . . .").

80.     The Gardinas conduct was fraudulent, malicious, deliberately oppressive, committed with the wrongful intention of injuring Prudential, and from an improper motive amounting to malice, such as to indicate wanton disregard for the rights of Prudential.  Prudential is therefore entitled to recover punitive damages from the Gardinas in an amount according to proof at trial.

US_ACTIVE\123805742\V-12

## SECOND CLAIM FOR RELIEF
### (Fraudulent Concealment against Carol and George Gardina)

81.    Prudential incorporates the allegations in paragraphs 1 through 71 by this reference.

82.    The Gardinas willfully and intentionally engaged in fraud and concealment.

83.    The Gardinas intentionally concealed from Prudential material facts, and/or suppressed the truth, regarding their respective health and eligibility under their respective Policies for LTC Benefits.  The Gardinas did so by concealing, and/or suppressing the truth of, *inter alia*, the true nature of their health, their ability to perform activities of daily living without substantial assistance, and that their cognitive impairment, if any, was moderate at best.  The Gardinas knew Prudential would not pay their respective LTC Benefits if they truthfully reported their health to Prudential.

84.    The Gardinas acts, representations, and communications with Prudential about the status of their respective health and eligibility under their respective Policies for LTC Benefits were knowingly false and made with the intent that Prudential rely on their false representations and to conceal from Prudential that the Gardinas were ineligible under their respective Policies for LTC Benefits.

85.    Prudential was unaware of these concealed material facts and would have acted differently had the concealed facts been disclosed.

-29-

86.     As a direct and proximate result of the Gardinas' fraudulent concealment, Prudential paid benefits of at least $1,187,580.67 to Carol Gardina. Prudential incurred additional losses in an amount to be determined at trial relating to the cost of investigating the claim.

87.     Prudential further contends that a result of the Gardinas' fraudulent concealments, the Gardinas respective Policies are void or should be voided. *Lincoln Benefit Life Co. v. Dallal*, 520 F.Supp.3d 1237, 1246-47 (C.D. Cal. 2021) (voiding a long-term care policy, which otherwise lacked an express void for fraud provision, pursuant to the district court's powers in equity where insurer established insured committed fraud), *aff'd*, 2022 WL 605709 (9th Cir. Mar. 1, 2022); *Circle Fin. Co. v. Peacock*, 399 So. 2d 81, 84 (Fla. Dist. Ct. App. 1981) ("[I]n equitable actions, it is recognized that the courts have the fullest liberty in molding decrees to the necessity of the action . . . .").

88.     The Gardinas' conduct was fraudulent, malicious, deliberately oppressive, committed with the wrongful intention of injuring Prudential, and from an improper motive amounting to malice, such as to indicate wanton disregard for the rights of Prudential.  Prudential is therefore entitled to recover punitive damages from the Gardinas in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment: No Coverage as to Carol Gardina)

89.    Prudential incorporate the allegations in paragraphs 1 through 71 by this reference.

90.    An actual and present legal controversy exists between Prudential and Carol Gardina.  Prudential contends Carol Gardina is not, and was not, entitled to LTC Benefits under her Policy.  Carol Gardina claims she was, and is, entitled to LTC Benefits under her Policy.

91.    Prudential has no adequate remedy at law.

92.    Prudential desires a judicial declaration of its rights and obligations under the Policies.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment: No Coverage as to George Gardina)

93.    Prudential incorporate the allegations in paragraphs 1 through 71 by this reference.

94.    An actual and present legal controversy exists between Prudential and George Gardina.  Prudential contends George Gardina is not, and was not, entitled to LTC Benefits under her Policy.  George Gardina claims he was, and is, entitled to LTC Benefits under his Policy.

95.    Prudential has no adequate remedy at law.

-31-

96.     Prudential desires a judicial declaration of its rights and obligations under the Policies.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment: Entire Policy Void as to Carol Gardina)

97.     Prudential incorporates the allegations in paragraphs 1 through 71 by this reference.

98.     An actual and present legal controversy exists between Prudential and Carol Gardina.  Prudential contends Carol Gardina is not, and was not, entitled to LTC Benefits under her Policy, and that she only received said LTC Benefits as a result of Carol Gardina's fraudulent misrepresentations and/or concealments.  Carol Gardina claims she is entitled to LTC Benefits under her Policy, and that she made no misrepresentations or concealments.  Prudential further contends that a result of Carol Gardina's fraudulent misrepresentations and/or concealments, Carol Gardina's Policy is void.  *Lincoln Benefit Life Co. v. Dallal*, 520 F.Supp.3d 1237, 1246-47 (C.D. Cal. 2021) (voiding a long-term care policy, which otherwise lacked an express void for fraud provision, pursuant to the district court's powers in equity where insurer established insured committed fraud), *aff'd*, 2022 WL 605709 (9th Cir. Mar. 1, 2022); *Circle Fin. Co. v. Peacock*, 399 So. 2d 81, 84 (Fla. Dist. Ct. App. 1981) ("[I]n equitable actions, it is recognized that the courts have the fullest liberty in molding decrees to the necessity of the action . . . .").  Carol Gardina contends that her Policy is not void.

-32-

99.    Prudential has no adequate remedy at law.

100.    Prudential desires a judicial declaration of its rights and obligations under the Policies.

### SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment: Entire Policy Void as to George Gardina)

101.    Prudential incorporates the allegations in paragraphs 1 through 71 by this reference.

102.    An actual and present legal controversy exists between Prudential and George Gardina.  Prudential contends George Gardina is not, and was not, entitled to LTC Benefits under his Policy, and that he only received said LTC Benefits as a result of George Gardina's fraudulent misrepresentations and/or concealments. George Gardina claims he is entitled to LTC Benefits under his Policy, and that he made no misrepresentations or concealments.  Prudential further contends that a result of George Gardina's fraudulent misrepresentations and/or concealments, George Gardina's Policy is void. *Lincoln Benefit Life Co. v. Dallal*, 520 F.Supp.3d 1237, 1246-47 (C.D. Cal. 2021) (voiding a long-term care policy, which otherwise lacked an express void for fraud provision, pursuant to the district court's powers in equity where insurer established insured committed fraud), *aff'd*, 2022 WL 605709 (9th Cir. Mar. 1, 2022); *Circle Fin. Co. v. Peacock*, 399 So. 2d 81, 84 (Fla. Dist. Ct. App. 1981) ("[I]n equitable actions, it is recognized that the courts have the fullest

US_ACTIVE\123805742\V-12

liberty in molding decrees to the necessity of the action . . . .").  George Gardina

contends that his Policy is not void.

103.  Prudential has no adequate remedy at law.

104.  Prudential desires a judicial declaration of its rights and obligations

under the Policy.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy against Carol and George Gardina )

105.  Prudential incorporates the allegations in paragraphs 1 through 71 by

this reference.

106.  Carol and George Gardina are parties to a conspiracy.

107.  There was an agreement between Carol and George Gardina to do an

unlawful act or to do a lawful act by unlawful means, there were overt acts in

furtherance of the conspiracy, and Prudential was damaged as a result of acts done

under the conspiracy.  By way of example, said overt acts include, but are not limited

to:

    a) Carol Gardina, through and with the assistance of George Gardina, her power of attorney, submitting fraudulent claim forms, on a monthly basis, which falsely attested that she suffered from a Chronic Illness or Disability;

    b) Carol Gardina presenting herself, on an annual basis, as bedbound and suffering with severe dementia.

    c) Staging demonstrations to Carol Gardina's medical providers in order to induce them to providing false and misleading information regarding Carol Gardina's health, which was then transmitted to

-34-

Prudential for the purposes of lulling Prudential into a false sense of security regarding Carol Gardina's purported health.

108. As described above, the basis of the conspiracy is Defendant Carol Gardina, through and with the assistance of Defendant George Gardina, her power of attorney, intentionally misrepresenting and/or concealing from Prudential the true and material facts regarding her eligibility under her respective Policy for LTC Benefits.

109. Carol and George Gardina entered into a conspiracy and acted in concert to intentionally misrepresent and/or conceal from Prudential the true and material facts regarding Carol Gardina's eligibility under her respective Policy for LTC Benefits. Carol and George Gardina acted in concert in making their false representations so as to deceive Prudential such that the Gardinas could unlawfully misappropriate LTC Benefits for their own personal gain.

110. Carol and George Gardina acted with full knowledge and awareness that their scheme was designed to fraudulently procure LTC Benefits from Prudential under the guise of Carol Gardina's purported eligibility.

111. Carol and George Gardina acted contrary to law, acted according to a predetermined and commonly understood plan of action for the purposes of falsely obtaining LTC Benefits from Prudential, and took overt acts in furtherance of the conspiracy.

-35-

112. There was a meeting of the minds between and among Carol and George Gardina to commit the unlawful acts alleged herein.

113. As a result of the conspiracy, Prudential has suffered damages according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Prudential prays for relief and judgment in its favor and against the Gardinas as follows:

1. For compensatory damages, subject to proof at trial, including but not limited to, the amount Carol Gardina received in LTC Benefits, which is no less than $1,187,580.67.

2. For compensatory damages, according to proof at trial, including but not limited to the amount Prudential incurred investigating the Gardinas' misconduct.

3. For interest, including prejudgment interest, at the legal rate;

4. For punitive damages;

5. For attorney's fees;

6. For declaratory relief;

7. For costs of suit; and

8. For such other relief as is fair, just, and equitable.

## DEMAND FOR JURY TRIAL

Prudential hereby demands a jury trial on all triable issues.

Respectfully submitted,

/s/ Angel A. Cortiñas
Angel A. Cortiñas, FBN 797529
Jonathan H Kaskel, FBN 52718
Dentons US LLP

-36-

-37-

1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone:  305-537-0009
angel.cortinas@dentons.com
jonathan.kaskel@dentons.com

Andrew S. Azarmi, *Pro Hac Vice forthcoming*
Seena Forouzan, *Pro Hac Vice forthcoming*
DENTONS US LLP
1999 Harrison Street, Suite 1300
Oakland, CA  94612
Telephone:  415-882-5000
andrew.azarmi@dentons.com

Kelly R. Graf, *Pro Hac Vice forthcoming*
DENTONS US LLP
601 South Figueroa St., Ste. 2500
Los Angeles, CA  90017-5704
Telephone:  213-623-9300
Facsimile:   213-623-9924

**Counsel for Plaintiff**
**The Prudential Insurance Company**
**of America**

-37-