UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

     Plaintiff,

v.                          Case No: 6:23-cv-1125-JSS-DCI

CAROL GARDINA and GEORGE
GARDINA,

     Defendants.
_____/

## ORDER

     Defendants Carol Gardina and George Gardina move for summary judgment. (Motion, Dkt. 87.) Plaintiff Prudential Insurance Company of America opposes the Motion. (Dkt. 94.) For the reasons outlined below, the court denies the Motion.

## BACKGROUND

     On February 8, 2002, Plaintiff issued two long-term care insurance policies, one to Mr. Gardina and one to Mrs. Gardina, who are married. (Dkts. 87 at 3; 87-2; 87-3.) The policies provide long-term care benefits for insureds diagnosed with a chronic illness or disability as defined in the policies. (Dkt. 87 at 3.) The policies define a chronic illness or disability as follows:

> An illness or disability in which there is:
>
> 1) A loss of the ability to perform, without substantial assistance, at least two activities of daily living for a period of at least 90 consecutive days; or

2) A severe cognitive impairment, which requires substantial assistance to protect you from threats to health or safety.

(Dkts. 87-2; 87-3.)  Substantial assistance is defined as follows:

1)  The physical assistance of another person without which you would not be able to perform an activity of daily living; or

2)  The constant presence of another person within arm's reach that is necessary to protect you from threats to your health or safety.

(*Id.*)  Activities of daily living are defined as follows:

**Bathing** - Washing oneself by sponge bath, or in either a tub or shower, including the task of getting into or out of the tub or shower.

**Continence** - The ability to maintain control of bowel and bladder function, or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

**Dressing** - Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

**Eating** - Feeding oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by feeding tube or intravenously.

**Toileting** - Getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

**Transferring** - Sufficient mobility to move into or out of a bed, chair or wheelchair or to move from place to place, either by walking, using a wheelchair or by other means.

(*Id.*)  A cognitive impairment is defined as follows:

A loss or deterioration in intellectual capacity that is:

1) Comparable to and includes Alzheimer's disease and
   similar forms of irreversible dementia;
2) Measured by clinical evidence and standardized tests that
   reliably measure impairment in the individuals
   a. short-term or long-term memory;
   b. orientation as to people, places, or time
      and
   c. deductive or abstract reasoning.

(*Id.*) Last, substantial supervision is defined as "[c]ontinual oversight that may include cueing by verbal prompting, gestures, or other demonstrations by another person, which is necessary to protect you from threats to your health or safety." (*Id.*) The policies include a cash benefit rider that permits the insured to choose a caregiver that will be paid under the policy for the care given to the insured regardless of the duration of care provided. (*Id.*) The policies require Defendants to undergo physical examinations to assess their continuing eligibility for benefits. (Dkt. 87 at 6.)

**1. Mrs. Gardina's Claim**

From April 23, 2002, to May 20, 2002, Mrs. Gardina was hospitalized for the care and treatment of a brain hemorrhage and aneurysm. (*Id.* (citing Dkt. 87-5).) At the hospital, Mrs. Gardina underwent a right frontal ventriculostomy and coil therapy on her right internal carotid artery. (*Id.*) In June 2002, Mrs. Gardina submitted a claim for benefits to Plaintiff, with the help of Mr. Gardina. (*Id.* (citing Dkt. 87-6).) Plaintiff initially approved Mrs. Gardina's claim. (Dkt. 87 at 6.)

On October 22, 2004, Plaintiff asked Mrs. Gardina to undergo an independent medical examination. (Dkt. 87 at 6–8 (citing Dkts. 87-8; 87-10; 87-11; 87-12; 87-14).)

Plaintiff explained that a review of the submitted medical documentation did not confirm that Mrs. Gardina still had a chronic illness or disability. (*Id.*) Mrs. Gardina underwent the independent medical examination as requested. The results indicated that she could not perform activities of daily living and that she had a cognitive impairment as defined by the policy. (*Id.*) Thereafter, on January 26, 2005, Plaintiff approved Mrs. Gardina's claim for benefits. (Dkts. 87-6; 94 at 3.)

Although Plaintiff asserts that Defendants fraudulently misrepresented Mrs. Gardina's health during this period, Plaintiff paid Mrs. Gardina benefits every month from June 2002 until June 2023. (Dkt. 87 at 6.) According to Plaintiff, a benefit eligibility assessment is a tool Plaintiff uses to assess an insured's claimed condition. (Dkt. 94 at 5.) During the assessment, a third-party registered nurse hired by Plaintiff visits the insured's home, confirms their identity, conducts physical demonstrations of activities of daily living, and tests for cognitive functioning. (*Id.* at 9–10.) Mrs. Gardina presented for periodic benefit eligibility assessments as required by her policy. (*Id.*)

In June 2012, Plaintiff hired a third party to conduct an activity check on Mrs. Gardina. (*Id.*) Additionally, from April to May 2016 and June to August 2022, Plaintiff conducted video surveillance on Defendants. (*Id.* at 10.) On June 14, 2023, Plaintiff denied Mrs. Gardina's claim for benefits. (*Id.* (citing Dkt. 87-25).)

## 2. Mr. Gardina's Claim

On July 12, 2016, Mr. Gardina submitted a claim for long-term benefits due to bilateral rotator cuff tears, resulting in the need for assistance with three activities of

daily living —bathing, dressing, and toileting.  (Dkt. 87 at 11 (citing Dkt. 87-26).)  After submitting medical records and presenting for a benefit eligibility assessment, Plaintiff approved Mr. Gardina's claim.  (*Id*. (citing Dkts. 87-27; 87-28; 87-29).)  On April 3, 2020, Plaintiff asked Mr. Gardina to sign a medical authorization release to obtain records from one of his medical providers.  (Dkt. 87 at 11.)  The medical authorization release was needed to assess Mr. Gardina's continued eligibility for benefits.  Mr. Gardina declined to sign the release, and after multiple attempts to obtain the authorization, Plaintiff terminated Mr. Gardina's claim on July 21, 2020.  (Dkts. 87 at 11–12; 94 at 11–12.)  Mr. Gardina appealed the claim termination and asserted that Plaintiff breached the insurance contract.  (Dkt. 87 at 11 (citing Dkt. 87-33).) Plaintiff refused to consider Mr. Gardina's appeal without the requested medical authorization, and Plaintiff closed the appeal in December 2020.  (*Id*. at 11–12.)

In May 2022, Mr. Gardina initiated a new claim for benefits (*Id.* (citing 87-34).) On June 5, 2022, he underwent another benefit eligibility assessment and stated that he could not perform any activities of daily living.  (Dkt. 87 at 12 (citing Dkt. 87-35).) Plaintiff conducted video surveillance on Mr. Gardina before and after the assessment. (Dkt. 94 at 12–13.)  Plaintiff maintains that the video surveillance showed Mr. Gardina and a woman, who was later identified as Mrs. Gardina, driving, building a fence, shopping, performing chores, carrying lumber, walking, and performing other activities.  (*Id*.)

Thereafter, on September 28, 2022, Plaintiff denied Mr. Gardina's claim for benefits.  (Dkt. 87 at 12 (citing Dkt. 87-35).)  Mr. Gardina appealed this denial, but

Plaintiff closed his appeal and claim because it never received Mr. Gardina's medical authorization release to obtain his medical records.  (*Id.* at 12.)  Plaintiff also maintains it closed his claim because Mr. Gardina did not prove he was eligible for benefits. (Dkt. 94 at 3–4.)

On June 14, 2023, Plaintiff filed the instant action.  Plaintiff's Amended Complaint seeks legal and equitable damages against Defendants for the following claims: fraudulent misrepresentation (Count I); fraudulent concealment (Count II); declaratory judgments seeking a determination that Defendants are not entitled to coverage under the policies (Count III - Mrs. Gardina; Count IV - Mr. Gardina); declaratory judgments seeking a determination that Defendants' policies are void (Count V - Mrs. Gardina; Count VI - Mr. Gardina); and civil conspiracy (Count VII). (Dkt. 25.)  Defendants counterclaimed seeking damages against Plaintiff for breach of contract for denying Defendants' claims for benefits under their policies (Count I - Mrs. Gardina; Count II - Mr. Gardina).  (Dkt. 33.)  Defendants move for partial summary judgment on Counts I, II, V, VI, and VII of Plaintiff's Amended Complaint and all counts of their Counterclaim.

## APPLICABLE STANDARDS

Granting summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is considered "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is material for the purposes of

summary judgment only if it might affect the outcome of the suit under the governing law." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the [record], which it believes demonstrate the absence of a genuine issue of material fact.'" *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant shows that no evidence supports the non-moving party's case, "[t]he burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir. 1993)).

In determining whether a genuine dispute of material fact exists, "courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion," and "[a]ll reasonable doubts about the facts should be resolved in favor of" the non-moving party. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing *Clemons v. Dougherty County*, 684 F.2d 1365, 1368–69 (11th Cir. 1982)). "If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Federal jurisdiction in this matter is based on diversity of citizenship under 28 U.S.C. § 1332(a).  (Dkt. 1 ¶¶ 5–8.)  This court is therefore bound to apply the substantive law of the state in which it sits.  *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  Thus, Florida substantive law applies.  *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023).

## ANALYSIS

### A. Fraudulent Misrepresentation and Concealment (Counts I and II)

Defendants argue that Plaintiff's fraudulent misrepresentation and concealment claims fail as a matter of law.  (Dkt. 87 at 19–21.)  The court will discuss each claim in turn.

### 1. Fraudulent Misrepresentation

Under Florida law, a fraudulent misrepresentation claim requires evidence of the following: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce[s] another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

Defendants acknowledge making misrepresentations after 2022, although they do not specify which statements constitute misrepresentations.  (Dkt. 87 at 20.) Defendants deny making misrepresentations before 2022, and contend Plaintiff cannot prove they made such misrepresentations or that Plaintiff relied upon them to its detriment.  (*Id.*) Plaintiff responds that the evidence contained in the summary-

judgment record supports the contention that Plaintiff relied on Defendants' allegedly fraudulent representations about their health conditions in approving Defendants' claims for long-term care benefits. (Dkt. 94 at 19.)

Regarding Mrs. Gardina, Plaintiff provided the court with Mrs. Gardina's benefit eligibility assessment forms from 2006–2008, 2010, 2011, 2016, 2017, 2020, 2022, and 2023. (Dkts. 94-27, 94-28, 94-29, 94-30, 94-31, 94-37, 94-38, 94-40, 94-41, 94-48.) These assessments were conducted by a third-party registered nurse hired by Plaintiff to evaluate Mrs. Gardina's ongoing eligibility for benefits. The assessments show that Mrs. Gardina presented as having severe cognitive and functional mobility impairments, and she could not physically or mentally complete the assessments independently without Mr. Gardina. (*See generally id*.) For example, during her June 11, 2007 assessment, Mrs. Gardina, through her husband, represented that she did not know what day it was, who the current president was, could not remember three words mentioned to her a few minutes before, needed assistance with washing herself, changing or adjusting her clothing, using the bathroom, feeding herself, drinking fluids, was bed bound and unable to sit up or stand without significant discomfort or pain, and could only ambulate with a walker or wheelchair. (Dkt. 94-28.) Plaintiff contends that it relied on these representations to approve Mrs. Gardina's continuing claim for long-term care benefits. (Dkt. 25 ¶¶ 90–98.)

Defendants' neighbors, Curt and Antonia Horton testified that from 2007 to 2024, they observed Defendants almost daily. (Dkts. 94-4; 94-6.) During this period, Mrs. Gardina could engage in intelligent conversations, walk and stand without

assistance, dine at restaurants without help, travel internationally, and drive. (Dkts. 94-4 at 22:1–31:25, 34:1–44:25; 94-6 at 27:1–37:23.) Additionally, Mrs. Horton testified that in 2007, Mrs. Gardina used her active real estate license to help the Hortons close on the home they bought next to Defendants, and she helped them complete the required paperwork. (Dkt. 94-4 at 23:15–24:16.)

In recent years, Defendants presented Mrs. Gardina at her June 5, 2022, assessment as being unable to walk and only able to move around in a wheelchair. (Dkt. 45-24.) They also reported that she could not use utensils for eating, could not bathe because she could not lift her arms, and could not drive. (*Id.*) Plaintiff contends it relied on these representations to approve Mrs. Gardina's continuing claim for benefits. (Dkt. 25 ¶¶ 90–98.) Despite Defendants' representations concerning Mrs. Gardina's health conditions, Plaintiff's Amended Complaint contains still images of video surveillance of Defendants captured from June 9, 2022, July 10, 2022, July 5, 2022, and July 6, 2022, that contradicts the limitations Defendants set forth at the 2022 assessment. (*Id.* ¶ 51, Dkts. 94-42 & 94-43.) Plaintiff contends that surveillance conducted on the specified days shows Mrs. Gardina driving, entering, and exiting a vehicle independently, standing, lifting objects, and shopping—all activities Defendants claimed she could not perform. (Dkt. 25 ¶¶ 51–52.)

Plaintiff also alleges that during surveillance, Mrs. Gardina was observed carrying lumber. (*Id.* ¶ 51.) During his deposition on April 18, 2024, Mr. Gardina was shown the video surveillance and he subsequently admitted that Mrs. Gardina was capable of performing plumbing, electrical work, nailing, and construction tasks.

(Dkt. 94-2 at 162:8–163:3.)  Mr. Gardina also testified that Mrs. Gardina could drive a backhoe and bulldozer.  (*Id*. at 163:4–12.)

As for Mr. Gardina, Plaintiff provided the court with Mr. Gardina's benefit eligibility assessment forms from 2017, 2018, and 2022. (Dkts. 94-38 & 94-45.) During the assessments, Mr. Gardina maintained that he has severe functional mobility impairments. (*See generally id*.) For example, during his June 1, 2022, assessment, Mr. Gardina stated that he could not drive, needed assistance with washing himself, changing or adjusting his clothing, using the bathroom, feeding himself, and could only ambulate with a walker or wheelchair. (Dkt. 94-45.)  Plaintiff contends that it relied on these representations to approve Mr. Gardina's continuing claim for benefits. (Dkt. 25 ¶¶ 90–98.)   Notwithstanding its claims, Plaintiff also contends that video surveillance of Mr. Gardina before and after this assessment shows Mr. Gardina walking, driving, carrying lumber, building a fence, shopping, and securing a boat to a trailer.  (Dkts.  94-42; 94-43.)  Mr. Gardina admitted during his deposition that he was captured on video surveillance securing a boat to a trailer and carrying lumber. (Dkt. 94-2 at 163:1–165:24.)

Considering the evidence and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has presented sufficient evidence from which a jury could infer that Defendants knowingly and falsely misrepresented their health conditions to induce Plaintiff to provide benefits under the policies.  Indeed, "cases in which the underlying issue is one of motivation, intent, or some other subjective facts are particularly inappropriate for summary judgment." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d

1236, 1243 (11th Cir. 2013) (per curiam) (internal quotations omitted). "If the evidence raises an issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it." *Moore v. Morris*, 475 So. 2d 66, 668 (Fla. 1985). Moreover, "fraud is not ordinarily a suitable subject for summary judgment." *Richards v. Wax*, 511 So. 2d 433, 434 (Fla. Dist. Ct. App. 1987) (alteration in original) (quoting *Levey v. Getelman*, 408 So. 2d 663, 665 (Fla. Dist. Ct. App. 1981)). "[I]t is a subtle thing requiring a full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute a fraud." *Id.* (alteration in original) (quoting *Amazon v. Davidson*, 390 So. 2d 383, 385 (Fla. Dist. Ct. App. 1980)). *See Grimes v. Lottes*, 241 So. 3d 892, 897–98 (Fla. Dist. Ct. App. 2018) (reversing grant of summary judgment in favor of the defendants as to the plaintiffs' fraudulent misrepresentation and concealment claims when genuine issues of material fact existed). The Motion is therefore denied as to this claim.

### 2. Fraudulent Concealment

Under Florida law, a fraudulent concealment claim requires evidence that a party (1) "concealed or failed to disclose a material fact"; (2) that they "knew or should have known the material fact should be disclosed"; (3) "knew their concealment of or failure to disclose the material fact would induce the plainitff[] to act"; (4) "had a duty to disclose the material fact"; and (5) "the plaintiff[] detrimentally relied on the misinformation." *Hess v. Phillip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

Defendants argue that they did not have a duty to disclose the accurate nature of their health because such duty arises under Florida law only when there is a fiduciary relationship. (Dkt. 87 at 20–21 (citing *Greenberg v. Miami Child.'s Hosp. Rsch. Inst.*, 264 F. Supp. 2d 1064, 1073 (S.D. Fla. 2003); *State v. Mark Marks, P.A.*, 654 So. 2d 1184, 1189 (Fla. Dist. Ct. App. 1995)).) Defendants also maintain that Florida law makes clear that Plaintiff's and Defendants' first-party contractual relationship is an adversarial rather than a fiduciary relationship. (*Id.* (citing *Greenberg v. Miami Child.'s Hosp. Rsch. Inst.*, 264 F. Supp. 2d 1064, 1073 (S.D. Fla. 2003))). Plaintiff responds to the contrary, explaining that under Florida law, all material facts must be disclosed when parties are engaged in an arm's-length transaction. (Dkt. 94 at 20 (citing *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. Dist. Ct. App. 1994); *Vokes v. Arthur Murray, Inc.*, 212 So. 2d 906, 909 (Fla. Dist. Ct. App. 1968)).)

The duty to disclose "arises when one party has information which the other party has a right to know because there is a fiduciary or other relation of trust or confidence between the two parties." *Garofalo v. Proskauer Rose LLP*, 253 So. 3d 2, 7 (Fla. Dist. Ct. App. 2018.) "Whether the duty exists is a question of law." *Id.* Ordinarily, failing to disclose material facts in an arm's-length transaction is not actionable. *See Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 540–41 (Fla. Dist. Ct. App. 2003). There are some exceptions, however. Specifically, "where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Gutter*, 631 So. 2d at 1118–19; *Artec Grp., Inc. v.*

*Chugach Mgmt. Servs., Inc.*, 470 F. Supp. 2d 1353, 1356 (M.D. Fla. 2006) (same (citing *id.*)). Indeed, "[e]ven in contractual situations where a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, the law is if he undertakes to do so[,] he must disclose the [w]hole truth." *Vokes*, 212 So. 2d at 909.

Since Defendants undertook to disclose some information that Plaintiff does not dispute as accurate regarding Mrs. Gardina's 2002 brain hemorrhage and aneurysm, they had an ongoing duty to disclose all material facts about Mrs. Gardina's health. Likewise, since Mr. Gardina undertook to disclose some information about his bilateral rotator cuff tears, which Plaintiff does not dispute as accurate, he had an ongoing duty to disclose all material facts about his health. Thus, the court finds that Defendants had an ongoing duty to disclose the accurate nature of their health and ability to perform activities of daily living.

Further, Plaintiff provided sufficient evidence supporting the contention that the Gardinas concealed or failed to disclose the true nature of their health at their benefit eligibility assessments to induce Plaintiff to continue to approve their claims for long-term care benefits. Thus, after considering the evidence and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has presented sufficient evidence from which a jury could infer that Defendants fraudulently concealed material information in the parties' arm's-length transaction. As a result, the Motion is denied as to this claim.

**B. Statutes of Limitations and Repose (Counts I, II, VII)**

Defendants contend that Plaintiff's claims for fraudulent misrepresentation (Count I), fraudulent concealment (Count II), and civil conspiracy (Count VII) are barred by the applicable four-year statute of limitation.  (Dkt. 87 at 14.)

**1.  Statute of Limitations (Counts I and II)**

The "statute of limitations is a procedural statute which bars enforcement of an accrued cause of action." *WRH Mortg., Inc. v. Butler*, 684 So. 2d 325, 327 (Fla. Dist. Ct. App. 1996); *see also Riverside Ave. Prop., LLC v. Riverside Condo. Ass'n, Inc.*, 352 So. 3d 997, 1002 (Fla. Dist. Ct. App. 2021) ("'A prime purpose underlying statutes of limitation is to protect defendants from unfair surprise and stale claims.'") (quoting *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1074–75 (Fla. 2001))); *Morsani*, 790 So. 2d at 1075 (explaining that the statute of limitations is meant to deprive "one who has willfully or carelessly slept on his legal rights [of] an opportunity to enforce an unfresh claim against a party who is left to shield himself from liability with nothing more than tattered or faded memories, misplaced or discarded records, and missing or deceased witnesses') (quoting *Nardone v. Reynolds*, 333 So. 2d 25, 36 (Fla. 1976))). Under Florida law, the statute of limitations is an affirmative defense. *See Rigby v. Liles*, 505 So. 2d 598, 601 (Fla. Dist. Ct. App. 1987) (collecting cases).

Actions for fraud are subject to a four-year statute of limitations.  Fla. Stat. § 95.11(3)(i).  Generally, the "time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." Fla. Stat. §

95.031. "A cause of action accrues when the last element constituting the cause of action occurs." Fla. Stat. § 95.031(1). The last element of a fraudulent misrepresentation claim is "consequent injury by the party acting in reliance on the [fraudulent] representation." *Butler*, 44 So. 3d at 105 (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)). Similarly, establishing the last element of a fraudulent concealment claim requires a plaintiff to prove that it "detrimentally relied on the misinformation." *Hess*, 175 So. 3d at 690.

Fraud cases, however, "must be begun within the period prescribed in [the statute,] with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence[.]" Fla. Stat. § 95.031(2)(a); *see Moneyhun v. Vital Indus., Inc.*, 611 So. 2d 1316, 1322 (Fla. Dist. Ct. App. 1993); *Bearse v. Main St. Investments*, 220 F. Supp. 2d 1338, 1344–45 (M.D. Fla. 2002); *Knight v. E.F. Hutton & Co.*, 750 F. Supp. 1109, 1113–14 (M.D. Fla. 1990). This "delayed discovery doctrine. . . delays [the] commencement of the statute of limitations." *Davis v. Monahan*, 832 So. 2d 708, 708 (Fla. 2002). The Florida Supreme Court explained in *Davis*:

> The Florida Legislature has stated that a cause of action accrues or begins to run when the last element of the cause of action occurs. An exception is made for claims of fraud and products liability in which the accrual of the causes of action is delayed until the plaintiff either knows or should know that the last element of the cause of action occurred.

*Davis*, 832 So. 2d at 709. Defendants argue that the delayed discovery doctrine does not apply because there is "no evidence that the Gardinas engaged fraudulent means"

to prevent Plaintiff from discovering their alleged fraud. (Dkt. 87 at 15.) Plaintiff
responds that the delayed discovery doctrine applies because the evidence in the record
supports the contention that Defendants actively concealed their fraud. (Dkt. 94 at
15.) The delayed discovery doctrine applies to Plaintiff's fraudulent misrepresentation
and concealment claims. *See* Fla. Stat. § 95.031(2).

Defendants have provided no evidence or argument to support their claim that
Plaintiff failed to exercise due diligence in uncovering Mr. Gardina's alleged fraud
concerning the benefits he received under his policy. (Dkt. 87 at 14–19.) Therefore,
the court will not consider the statute of limitations related to Mr. Gardina's alleged
fraud. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007)
(declining to address an argument because it was perfunctory, underdeveloped, and
not supported by citation to authority); *Resol. Tr. Corp. v. Dunmar*, 43 F.3d 587, 599
(11th Cir. 1995) ("There is no burden upon the district court to distill every potential
argument that could be made based upon the materials before it.").

Defendants rely on the following evidence to support the contention that
Plaintiff did not exercise due diligence to uncover Defendants' alleged fraud in
connection with Mrs. Gardina's claim. First, Defendants rely on two medical review
opinions from 2004. (Dkts. 87 at 15–16; 87-38 at 2–3; 87-39 at 7.) That year, Plaintiff
hired Dr. James Fegan to review Mrs. Gardina's medical records from her treating
physicians and conduct an initial external assessment. (*Id*.) The record reviews
occurred on May 12, 2004, and October 12, 2004. (Dkts. 87-38, 87-39.) After
reviewing the records, Dr. Fegan recommended that Mrs. Gardina undergo an

independent medical examination due to his doubts regarding her claim based on the

medical records provided.  (*Id.*)  In response to these opinions, Plaintiff sent Mrs.

Gardina a letter informing her that the medical documentation she had submitted thus

far did not demonstrate the existence of a functional limitation affecting her ability to

perform activities of daily living.  (Dkt. 87-14.)  The letter also requested that Mrs.

Gardina undergo an examination, as suggested by Dr. Fegan.  (*Id.*)  The letter warned

Mrs. Gardina that if Plaintiff did not receive the results of the examination by January

24, 2005, it would close her claim due to insufficient medical documentation

establishing a "chronic illness or disability" as defined by the policy.  (*Id.*)  On January

5, 2005, Mrs. Gardina presented to Dr. Andrew L. Sherman for the examination.

(Dkt. 87-15.)  After conducting the examination, Dr. Sherman opined:

> In my opinion, this is an extremely difficult but unusual
> case. This is a patient who had a subarachnoid hemorrhage
> and has suffered the complications of reduced memory,
> mild left hemiparesis[,] and lack of judgment and awareness
> of her condition. Her treatment has been atypical in that she
> never had a course of inpatient rehabilitation[.] [S]he has
> never had a course of speech therapy on a regular basis to
> gauge her ability to exist in independent situations. My
> feeling is that the patient has become completely dependent
> on her husband. Whether or not this would have been the
> case with an inpatient rehabilitation stay can never be
> known. The reality is that the patient is completely
> dependent on her husband for most, if not all, activities of
> daily living. The patient is now two and three-quarter years
> post injury. It is unlikely that after that much time has
> elapsed since her injury that her rehabilitation potential will
> be very high. In fact, it would be unlikely at this point for
> the patient to regain any function that is useful. Therefore,
> I believe the patient does meet eligibility for disability in that
> she is unable to perform at least activities of daily living for

over 90 days[,] and she has severe cognitive impairment that
requires 24-hour supervision to protect her own safety.

(Dkt. 87-15 at 4.)   After reviewing Dr. Sherman's report, Plaintiff approved Mrs.

Gardina's claim for long-term care benefits on January 26, 2005.   (Dkt. 87-16.)

Plaintiff maintains that although Mrs. Gardina might "have been genuinely eligible

for benefits for some amount of time after her aneurysm . . . [b]y 2006 at the latest,

however, [Mrs. Gardina] was independent with her [a]ctivities of [d]aily [l]iving."

(Dkt. 94 at 6.)   As Plaintiff does not dispute the necessity of long-term care benefits

prior to 2006, the court will not consider the medical opinions from Drs. Fagan and

Sherman for statute of limitations purposes.

Second, Defendants rely on an activity check requested by Plaintiff on May 16,

2012, to confirm Mrs. Gardina's condition.  (Dkt. 87 at 16.)  In a letter sent to Plaintiff

on June 5, 2012, the investigator summarized their findings as follows:

> As a result of our investigation, we were able to confirm that
> Ms. Carol J. Gardina continued to reside at 10633 Leafy
> Way, Orlando, Florida, along with her husband[,] George.
> As noted by the Reader, the subject appeared to be affiliated
> with several different entities. Specifically, the claimant was
> operating Wildflower Society, which was a non-profit
> organization that helped out people and organizations that
> were beautifying their surroundings. This organization was
> being operated out of a family member's home at one point.
> Our source could not recall any recent events being held by
> the subject and her organization. Neighbors noted that the
> claimant always had 'odd jobs' and multiple jobs taking
> place. She was described as an entrepreneur, but none of the
> businesses appeared to take up much of her time. The
> claimant and her husband also received supplemental
> income from two rental properties, also on Leafy Way. The
> claimant's husband, being a contractor by trade, was the
> main individual who maintained the properties. Neighbors

> noted that the claimant was an avid gardener who enjoyed planting flowers and going to various plant stores. She also spent a lot of time with her family when her husband was working during the day.

(Dkt. 87-18 at 1.)    Based on these observations, the investigator recommended additional surveillance.  (*Id*. at 1–2.)  Plaintiff does not dispute that an activity check was conducted.  The activity check indicates a discrepancy in Mrs. Gardina's activity level, as her neighbors noted that she had sufficient physical ability to care for a garden and the mental capacity to engage in entrepreneurial efforts.  In contrast, not long after receiving the activity check, Plaintiff contends that it received new medical records from Mrs. Gardina's treating physicians.  (Dkts. 94 at 8–9; 94-7 at 7.)  These records reflected that Mrs. Gardina had severe limitations in functional capacity and required 24-hour observation because of her memory disorder and active assistance with all daily activities.  (Dkts. 94 at 8–9; 94-7 at 7.)  Notwithstanding the newly received medical records, a reasonable jury could conclude that Plaintiff should have diligently followed up on the activity check with additional surveillance.

Third, Defendants rely on video surveillance requested by Plaintiff on April 22, 2016.  (Dkt. 87 at 17–18.)  In a letter sent to Plaintiff on May 9, 2016, the investigator summarized his findings as follows:

> The claimant is currently believed to be residing at 10621 Leafy Way, Orlando, FL, which is an address she is also associated with. V[ideo] was obtained of the claimant walking, standing, bending, carrying items, assisting her spouse with carrying a mattress, carrying a small table, checking the mail and entering and exiting the vehicle, pushing a wheelbarrow, conversing, holding a rope, checking the mail and entering and exiting the residences

> and vehicle. The claimant was observed to ambulate
> normally without the use of any visible medical devices.

(Dkt. 87-19 at 2.) Plaintiff does not dispute that it requested and received surveillance footage of Mrs. Gardina in 2016. Although the court was only provided a written summary of the video surveillance, Defendants do not contest the accuracy of the summary. The court finds that a reasonable jury could conclude that the video surveillance is an indication of fraudulent activity that Plaintiff should have pursued diligently.

Plaintiff maintains that it could only identify Mrs. Gardina as the woman being surveilled in the video once an employee took a photo of her during an eligibility assessment on April 21, 2023. (Dkts. 94-7 at 3–7; 94-22 at 6.) According to Plaintiff, it did not know what Mrs. Gardina looked like until receiving photographic confirmation of her likeness. At that point, Plaintiff allegedly realized Mrs. Gardina was the same person from the surveillance conducted in 2016 and 2022.[1] (Dkt. 94-22 at 6–7.) Thus, Plaintiff asserts that it could not discover the alleged fraud by Defendants until Mrs. Gardina's eligibility assessment for benefits in April 2023 due to Defendants' alleged ongoing misrepresentations, concealment, and lack of cooperation. (Dkts. 25 at ¶¶ 48–71; 94 at 15–17.)

Upon considering the evidence and drawing all reasonable inferences in Plaintiff's favor, a genuine dispute exists concerning whether Plaintiff's fraudulent

---

[1] Plaintiff maintains that assessors confirm the insured's identification before the assessment but generally do not take photographs of the insured at a benefit eligibility assessment. (Dkt. 94 at 5.)

misrepresentation and concealment claims are barred by the statute of limitations. Specifically, a genuine dispute exists regarding whether Plaintiff exercised due diligence in discovering the facts giving rise to its fraud claims against Mrs. Gardina after receiving the results of the activity check on June 5, 2012, the video surveillance on May 9, 2016, or at any other time before the benefit eligibility assessment conducted on April 21, 2023. *See Bd. of Trs. of Santa Fe Cmty. Coll. v. Caudill Rowlett Scott, Inc.*, 461 So. 2d 239, 242–43 (Fla. Dist. Ct. App. 1984) ("In order to succeed on a motion for summary judgment based upon the [s]tatute of [l]imitations, the movants in the case at issue [are] required to conclusively show that there exists no disputed issue of fact with respect to the date of the commencement of the limitations period[.]"); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("The commencement of the statute of limitations is a question of fact."). Accordingly, the court denies the Motion as to Defendants' statute of limitations argument.

## 2. Statute of Repose (Count VII)

Next, Defendants maintain that Plaintiff's civil conspiracy claim is barred by Florida's statute of repose. Plaintiff disagrees and contends that genuine issues of material fact remain for trial concerning the issue.

Under Florida law "[a]n actionable [civil] conspiracy [claim] requires an actionable underlying tort or wrong." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (quoting *Fla. Fern Growers Ass'n v. Concerned Citizens*, 616 So. 2d 562, 565 (Fla. Dist. Ct. App. 1993)). Put differently, a civil conspiracy claim "must be based on an existing independent wrong or tort that would constitute a valid cause of action

if committed by one actor." *Id.* Here, Plaintiff bases its civil conspiracy claim on its underlying actionable fraudulent misrepresentation and concealment claims. (Dkt. 25 ¶¶ 123–131.) Unlike Plaintiff's fraudulent misrepresentation and concealment claims, the delayed discovery doctrine does not apply to Plaintiff's civil conspiracy claim. *Davis*, 832 So. 2d at 709 (explaining that the delayed discovery doctrine does not apply to claims for civil conspiracy, breach of fiduciary duty, conversion, and unjust enrichment). However, the statute of repose is applicable here.

The statute of repose "is a substantive statute which not only bars enforcement of an accrued cause of action but may also prevent the accrual of a cause of action where the final element necessary for its creation occurs beyond the time period established by the statute." *WRH Mortg.*, 684 So. 2d at 327. Florida's statute of repose expressly provides that "[a]n action for fraud under [Florida Statute Section] 95.11(3) must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered." Fla. Stat. § 95.031(2)(a). The operative date for the commencement of the statute of repose "runs from the date of a discrete act on the part of the defendant without regard to when the cause of action accrued." *Kush v. Lloyd*, 616 So. 2d 415, 416 (Fla. 1992). Nevertheless, if the plaintiff has alleged numerous discrete fraudulent acts, "the defendant's last act or omission triggers Florida's fraud statute of repose." *Phillip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 (Fla. 2015); *see Phillip Morris USA Inc. v. Principe*, 337 So.3d 821, 827 (Fla. Dist. Ct. App. 2021) (discussing the application of the statute of repose).

Plaintiff maintains that Defendants' last fraudulent act was their misrepresentation that Mrs. Gardina needed significant assistance with activities of daily living during her benefit eligibility assessment on April 21, 2023. (Dkt. 25 ¶¶ 60–71, 123–131.)  Plaintiff denied Mrs. Gardina's claim for long-term care benefits after the April 2023 assessment.  If the jury finds that Defendants committed fraudulent misrepresentation and concealment, the jury will also determine when the last fraudulent act occurred.  This determination is a question of fact that the jury must decide.  *See Laschke v. Brown & Williamson Tobacco Corp.*, 766 So. 2d 1076, 1079 (Fla. Dist. Ct. App. 2000) (reversing grant of summary judgment on the plaintiffs' civil conspiracy claim finding that "the date of the last act done in furtherance of the conspiracy present[ed] a question of fact not proper for resolution on summary judgment"). The Motion is therefore denied as to this argument.

## C. Declaratory Relief (Counts V & VI)

Defendants maintain that Plaintiff's claim to void the policies (Counts V and VI) constitute equitable fraud claims that fail as a matter of law because Defendants had no legal duty to disclose the accurate nature of their health.  (Dkt. 87 at 21.) However, as Plaintiff persuasively explains, it does not allege equitable fraud in relation to these claims.  (Dkt. 94 at 20.)  Instead, because the policies lack an express void for fraud provision, Plaintiff seeks declarations that the policies are void for fraud if the jury makes that determination at trial.  (Dkts. 87-1; 87-2.)  "Unless waived, a jury must make findings concerning all facts which are common to the legal and equitable claims before the trial court may consider granting an equitable remedy."

- 24 -

*Billian v. Mobil Corp.*, 710 So. 2d 984, 992 (Fla. Dist. Ct. App. 1998); *see Lincoln Benefit Life Co. v. Dallal*, 520 F. Supp. 3d 1237, 1246–47 (C.D. Cal. 2021) (using the court's equitable authority to void a long-term care insurance policy that did not contain an express void for fraud provision after a jury trial verdict found that the insured defrauded the insurer when California law was ambiguous as to whether fraud voids a policy that lacks an express void for fraud provision), *aff'd,* 2022 WL 605709, at *3 (9th Cir. Mar. 1, 2022) (affirming policy invalidation under federal equitable powers). Thus, the court cannot conclude that Plaintiff's declaratory relief claims fail as a matter of law as they require a factual determination by the jury before they are ripe for adjudication by the court.  The Motion is therefore denied as to this argument.

## D. Federal Rule of Civil Procedure 9(b)

Defendants argue that Plaintiff's Amended Complaint should be dismissed because it violates the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).  (Dkt. 87 at 12–13.)  Plaintiff responds that Defendants have waived this argument by raising it for the first time during the summary judgment stage.  (Dkt. 94 at 18.)  Plaintiff also argues that Defendants had fair notice of Plaintiff's fraud claims.  (*Id.*)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). Rule 9(b) addresses the sufficiency of a plaintiff's complaint rather than the merits of the claims it contains, thus challenges to the adequacy of a fraud claim under this rule are generally made through a motion to dismiss under Rule 12(b), and "[a] party who

fails to raise a Rule 9(b) objection normally waives the requirement." *Lorali, Inc. v. SMK Assocs., LLC*, Case No. 13-CV-22204-WILLIAMS/SIMONTON, 2014 WL 12536977, at *6 (S.D. Fla. Aug. 26, 2014) (internal quotations omitted); *see also Milan v. Colvin*, No. 09-3666 (DWF/TNL), 2011 WL 1988205, at *5–6 (D. Minn. May 20, 2011) (declining to grant summary judgment on Rule 9(b) grounds after the defendant answered the complaint).

Indeed, a Rule 9(b) objection is waived if it is not raised in the first responsive pleading or in an early motion. *U.S. ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 25 (D.D.C. 2011); *see also* 2 James W. Moore et al., Moore's Federal Practice - Civil § 9.03 (3d ed. 2024) ("If the failure to plead with particularity under Rule 9(b) is not raised in the first responsive pleading or in an early motion, the issue will be deemed waived."). As Defendants did not raise this issue in their Motion to Dismiss (Dkt. 32) and their summary judgment motion contains detailed arguments refuting their alleged fraudulent behavior, the court finds that Defendants have waived their Rule 9(b) objection. Moreover, Defendants have responded to the Amended Complaint and demonstrated a full understanding of the claims against them. *See Davsko v. Golden Harvest Prods.*, 965 F. Supp. 1467, 1474 (D. Kan. 1997) (explaining the Rule 9(b) requirement helps ensure that the defendant can prepare an adequate responsive pleading). As a result, the Motion is denied as to this argument.

## E. Independent Tort Doctrine

Defendants renew their previous argument that Florida's independent tort rule bars Plaintiff's claims. (Dkt. 87 at 13–14.) Plaintiff responds that the independent tort rule does not apply because Plaintiff does not allege a breach of contract and seeks damages distinct and separate from any contractual damages. (Dkt. 94 at 18–19.)

The court will not consider this argument because Defendants improperly raised it by incorporating by reference the same argument from their Motion to Dismiss (Dkt. 32). *See* M.D. Fla. Loc. R. 3.01(f) ("A motion, other legal memorandum, or brief may not incorporate by reference all or part of any other motion, legal memorandum or brief.") The court declines to reconsider this argument as it was fully considered in the court's Order denying Defendants' Motion to Dismiss. (Dkt. 68.) In that ruling, the court determined that Florida's independent tort rule does not prevent Plaintiff's claims from proceeding. (*Id.*) The Motion is therefore denied as to this argument.

## F. Defendants' Counterclaims for Insurance Coverage

Defendants argue that Plaintiff breached the long-term care contracts by wrongfully terminating Defendants' benefits. (Dkt. 87 at 22–24.) Specifically, Defendants maintain that Plaintiff cannot prove that Mrs. Gardina did not need substantial assistance to perform at least two activities of daily living before 2022. (*Id.* at 22–23.) Defendants also maintain that Plaintiff wrongfully terminated Mr. Gardina's benefits when he failed to execute an authorization to release his medical records. (*Id.* at 23–24.) Plaintiff asserts that disputes of material facts exist concerning Defendants' representations and omissions related to their health. (Dkt. 94 at 4, 20.)

Plaintiff also contends it terminated the Gardinas contracts because they were not eligible for long-term care under the policies.  (*Id.*)

Based on the evidence presented and drawing all reasonable inferences in favor of Plaintiff, the court cannot conclude that Plaintiff breached the contracts.  Genuine disputes of material fact exist concerning whether Defendants' representations and omissions were fraudulent as discussed above since Prudential maintains it denied Defendants' claims for coverage because they were not eligible for long-term care under the policies.  *Homeward Real Est., Inc. v. Shoubaki*, 346 So. 3d 144, 148 (Fla. Dist. Ct. App. 2022) (explaining "whether there has been a breach of the terms of [a] contract is a question of fact"); *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1377 (S.D. Fla. 2019) (applying Florida law and denying summary judgment because there were genuine issues of material fact as to whether the defendants breached their contractual obligations). The Motion is therefore denied as to this argument.

## CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment

(Dkt. 87) is **DENIED**.

 **ORDERED** in Orlando, Florida, on December 17, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record